## PEOPLE *v.* WYMAN.

WHERE the convention of Justices of the Peace, for electing two Associate Justices of the Court of Sessions, was presided over by the then acting County Judge, his official acts at such convention were legal and valid—although it was afterwards determined that another person had been legally elected to that office; and a Court of Sessions, composed of said other person, as County Judge, and of the two associates, elected by such convention, was legally organized.

On an indictment for murder it appeared, that the prisoner on the day of the killing called at a mill, several hundred yards from where deceased was killed, and borrowed a chisel—having been previously in the habit of borrowing tools at the mill. His shirt was bloody, and two spots of skin were knocked off his nose. Defendant's counsel asked the witness, " Did he (prisoner) state how he came by those hurts? If so, state all the conversation then and there between you two, in respect to those hurts, and his errand there." Objected to and ruled out. *Held*, that there was no error in the ruling, the declarations not appearing to have any connection with the offense charged; that declarations of a prisoner, to be admissible as part of the *res gestæ*, must be contemporaneous with the main fact under consideration, and so connected with it as to illustrate its character.

*Held*, further, that even if in this case, such declarations were improperly excluded, the prisoner was not prejudiced, because he was convicted of manslaughter only, showing that the jury negatived the idea of malice and premeditation.

It is not error in the Court, in a criminal case, to charge the jury to give such weight to the defendant's confession as they deem it entitled to, "judging from the circumstances under which it was given, and the motives which would naturally actuate the party in giving it;" and that they might, in their discretion, believe a part, and disbelieve another part, of such confession.

A verdict, in a criminal case, cannot be impeached by an affidavit of one of the jurors, tending to show that it was not a fair expression of the opinion of the jury.

APPEAL from the Twelfth District.

Indictment for murder. The indictment was found at the July Term, 1859, of the Court of Sessions, B. F. Fox, then County Judge, presiding, Maxson and Crook being the Associate Justices. Maxson and Crook were elected such Associates at a convention of the Justices of the Peace of the county, held in October, 1858, over which H. Templeton presided, he being at that time the acting County Judge—pending a contest between himself and Fox, as to who was County Judge *de jure.* This contest resulted subsequently in favor of Fox.

Defendant moved, in the Twelfth District Court, to set aside the indictment, on the ground that it was not found by a legal Grand Jury,

or presented to a legally organized Court of Sessions, relying upon the invalidity of the election of Maxson and Crook. Motion overruled.

The facts pertinent to the second point considered by this Court are, that the State proved that the deceased came to his death from a wound between the fifth and sixth ribs, about half an inch wide and three quarters of an inch deep—made with a knife ; that there was, also, a slight abrasure of the skin upon the left eyelid—a black spot on the forehead, just above the root of the nose, about the size of the end of the forefinger ; that the bones of the nose were broken, though it was not cut or bruised upon the surface in any manner, nor was the skin raised. Physicians could not tell how the nose was broken—but it was not done with a knife—might have been made with a slungshot, a round stick, or possibly with the fist; there was, also, a slight flesh wound on the left hand, between thumb and finger, as if scratched with a knife.

The State then proved, by one Bowman, that on the day of the killing he was going along the road with his team, just below Connelly's mill, and met defendant on a horse, riding faster than usual, his shirt bloody on both sides. Asked him " what was the matter ? " and he replied that " Nathan had lit on him with a flask." Neither stopped, defendant going on towards the mill. After a while defendant came up again and passed me, going in the same direction ; that about one hundred and fifty rods further on he (witness) picked up a machiras, and three or four rods further on, saw deceased in a half lying, half sitting posture, leaning against the fence, dead; flesh around the neck being warm; no weapons near him; no signs of a scuffle; his hat lying in the road three or four rods further on ; large glass pickle jar ten feet from the hat, on side of the road, lying partly against the fence, its neck broken off. When I passed the defendant he had nothing in his hand, but when he passed me second time, he had in his hand a long chisel ; this was three hundred yards from the body of deceased. But, because of a bend in the road and bushes, I did not see defendant when he passed the spot where deceased lay. When I saw defendant last he was riding horseback, in the direction of deceased's body ; he had to pass that way to go home ; considerable horse-tracks in road where hat was found; road very dusty ; horse of deceased found half mile off without saddle cover; fence on one side of road, ditch on the other, scooped out a little by cattle running over it. As I was taking body home, again met defendant; he asked how deceased was—said

he would give himself up. Deceased in habit of carrying jar—milk in it. Defendant's horse skittish; deceased's gentle; little blood on deceased's hands; little on top rail of fence.

State also proved that on day of killing, defendant came into kitchen of Mr. Connelly's house and said he had got into muss etc., with deceased, and that he was about to get the better of him, and that he thought he had killed him—said he had met deceased, got into talk, deceased struck him with chunk bottle and knocked him off his horse, had scuffle—defendant slipped and fell into ditch, deceased on top, holding him down—would'nt get off—he stabbed him with his knife—deceased begged and rolled off in the ditch—defendant left for his horse, went to mill, told what had happened, came back, found deceased, who was still lying there, hence thought he had killed him. Witness saw blood on his shirt—he said it came from deceased—saw slight scratch on his nose—bleeding a little—he said if he had had pistol, would have riddled him, etc. Showed me the knife—small pocket knife—blade two to two and a half inches long, tapering to point—I thought there were slight marks of blood on the knife.

## PROSECUTION RESTED.

Defense then proved that defendant was partially crippled from rheumatism—that deceased was young, active and strong, weighing one hundred and seventy-five pounds, and lived one-half mile from defendant—that on the fifteenth June, 1859, he hurt his back and was laid up six or seven days—(the killing was June 25th)—that he had been working at carpenters' work in his barn sometime before killing, had tools there—the barn being in sight of spot—that on day of killing, defendant went to Connelly's mill and borrowed a paring chisel, three-quarters of an inch wide—very dull, gummed over from cleaning machinery of the mill. That in opinion of witness, defendant had not strength to drive chisel through body of a man with flannel shirts on. Defendant in habit of coming to mill to borrow tools—while at mill, shirt bloody, two spots of skin knocked off his nose. Defense then asked—" Did he (defendant) state how he came by those hurts? If so, state all that conversation then and there between you, witness and defendant in respect to these hurts, and his errand there." Objected to, defendant offering them as part of *res gestæ*, and second, as explaining his acts by declarations made at the time the acts were being performed. Objection sustained, defendant excepting.

The Court charged the jury, among other things, as stated in the opinion of this Court.  Verdict of manslaughter.  Defendant appeals.

*Wm. T. Gough*, for Appellant.

1. The indictment ought to have been set aside, because the Court of Sessions was not legally organized.  (Wood's Digest, 152, art. 662, sec. 49–50.)

2. The statement of defendant at Connelly's mill, as to the purpose for which he wanted the chisel, and as to the wounds on his face, were part of the *res gestæ* and admissible.  The testimony of the State laid the basis for the theory, that the chisel was used in inflicting some of the wounds on the deceased, and that the affray was not ended, nor the homicide complete until after defendant obtained the chisel and passed the body the second time.  What defendant said, therefore, when he borrowed the chisel, was part of the transaction.  (1 Greenleaf's Ev. sec. 108; *Enos* v. *Tuttle*, 3 Conn. 250; Roscoe's Crim. Ev. 22; 2. Harr. & McHen. 120; *United States* v. *Craig*, 4 Wash. C. C. 729; 2 J. J. Marsh. 380.)  Even on an indictment for manslaughter, such declarations are good.  (*State* v. *Powell*, 2 Halst. 244; 3 McCord, 232, note; 2 N. C. Law R. 432.)

3. The third instruction was wrong.  The jury cannot believe a part of the confession and disbelieve a portion, unless that portion is contradicted by other evidence.  (1 Greenleaf's Ev. sec. 218; *Rex* v. *Higgins*, 3 C. & P. 603; *Rex* v. *Steptoe*, 4 Id. 397, 221; *Respublica* v. *McCarty*, 2 Dall, 86, 88.)  If the State uses the prisoner's declarations, they must all be taken together, and no part of them can be rejected until proven, by other evidence, to be untrue.  (*Rex* v. *Jones*, 2 Carr & P. 629; *Tipton* v. *The State*, Peck. 308.)

4. The verdict was irregular.  (2 Yerg. 60; 7 Humph. 549; 9 Cal. 298.)

*Thos. H. Williams*, Attorney General, for Respondent.

COPE, J. delivered the opinion of the Court—BALDWIN, J. and FIELD, C. J. concurring.

The defendant was convicted of manslaughter.  None of the assignments of error are well taken.

1. There is nothing in the point that the Court of Sessions in which the indictment was found, was not legally organized.  The convention

at which the Associate Justices were elected, was presided over by a person who was then acting as County Judge, and the fact that it was afterward determined that another person had been legally elected to that office, did not render his official acts illegal and invalid.

2. The statements of the defendant, as to what he intended to do with the chisel borrowed at Connelly's mill, were properly excluded. They constitute no part of the *res gestæ.* Declarations, to become part of the *res gestæ,* "must have been made at the time the act was done which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them as obviously to constitute one transaction." (*Enos* v. *Tuttle,* 3 Conn. R. 250.) Greenleaf says upon this subject, that "the principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character." (1 Greenl. Ev. sec. 108.) The declarations in this case had no apparent connection with the commission of the offense with which the defendant was charged. He may have borrowed the chisel for one purpose, and afterward used it for another, not contemplated at the time; and it may be that his statements were intended to deceive, and that his real objects were very different from those stated. If such statements were admissible, a person intending to commit an offense could manufacture, in advance, any amount of evidence in his favor, and thus lay a safe and secure foundation for an acquittal, at the very time he is preparing for the commission of the offense. But even if these statements were, as an abstract proposition of law, improperly excluded, the error could not have prejudiced the defendant, for, although the indictment was for murder, he was only convicted of manslaughter, and of course the jury came to the conclusion that the killing was not malicious and premeditated.

3. The instruction asked by the prosecution was properly given. The whole of the defendant's confession was in evidence, and the jury were told to give it such weight as they should deem it entitled to, "judging from the circumstances under which it was given, and the motives which would naturally actuate the party in giving it;" and that they might, in their discretion, believe a part and disbelieve another part of the same confession. Confessions stand upon the same footing as other evidence, and are to be weighed by the jury in the same manner. "It is not to be supposed," says Greenleaf, "that all the parts of

a confession are entitled to equal credit. The jury may believe that part which charges the prisoner, and reject that which is in his favor, if they see sufficient grounds for so doing. If what he said in his own favor is not contradicted by evidence offered by the prosecution, nor improbable in itself, it will naturally be believed by the jury ; but they are not bound to give weight to it on that account, but are at liberty to judge of it, like other evidence, by all the circumstances of the case." (1 Greenl. Ev. sec. 218.) There is nothing in the instruction which is not in strict accordance with the principles here laid down.

The other points in the case are devoid of merit, and we shall not notice them at any length. It was, of course, improper for the defendant to prove what was said in a conversation between him and one of the witnesses several days after the commission of the offense, such conversation not having been referred to by the prosecution. The evidence was sufficient to justify the verdict, and the motion for a new trial on that ground was properly overruled. The verdict is sought to be impeached upon the ground that it was not a fair expression of the opinion of the jury, and the affidavit of one of the jurors is relied upon for that purpose. We have repeatedly decided that this cannot be done.

Judgment affirmed.