[Crim. No. 13012. Second Dist., Div. Five. Aug. 12, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN M. WILLIAMS, Defendant and Appellant.

James L. Flournoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark Christiansen, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant was charged as follows: count I—grand theft auto; count II—violation of section 10851 of the Vehicle Code; count III—battery on Officer Alderson; count IV—battery on Officer Pallas; count V—battery on Officer Sands; and count VI—battery on Officer Mize.[1] Defendant pleaded not guilty but admitted two prior convictions of automobile theft.

A jury found defendant guilty on counts II, III, IV and V. He was acquitted on count I. Count VI was dismissed after the jury reported itself unable to agree. Defendant was sentenced to concurrent prison terms.

Mrs. Kass parked her 1960 white Pontiac in a parking lot at 11 a.m. on July 20, 1966. When she returned at 5 p.m. the car was gone. She reported it as stolen later that afternoon. It was returned to her by the police on July 24.

On July 22, after 8 p.m., Officer Alderson observed a 1960 white Pontiac make a right turn against a red traffic light without stopping. He pursued the car on his motorcycle. His red lights were on. The car stopped, defendant got out and ran between two houses. The officer pursued him on foot.

Defendant tried to escape by climbing over a fence. Alderson stopped him by grabbing his shirt. Defendant then struck the officer on the right shoulder. A fight ensued. Defendant grabbed the officer's holster and jerked it and his gun from his belt. At that time another officer, Pallas, arrived. Defend-

---

[1] With respect to each battery count it was alleged that the victim was "a peace officer then and there engaging in the performance of his duties, and the said defendant then and there reasonably should have known that said peace officer was then and there a peace officer engaged in the performance of his duties."

ant swung his right fist at him and struck him on the right shoulder. Eventually the two officers subdued defendant and he was handcuffed.

Defendant was driven to the station by Officer Mize and Sands. Mize was driving, Sands was in the back seat with defendant. At one point during the drive defendant lifted both feet above the back seat [sic][2] and kicked Mize in the back of the head. Sands then tried to subdue him. In attempting to do so Sands himself was kicked on the left side of the head.[3]

Defendant testified to a totally different version of the fact. On July 22 he had been drinking all day at his girl friend's house. In the evening he started to walk home. He crossed a street against a red light. He then saw the officers coming and took off running. He justified the batteries of Alderson and Pallas as resistance to police brutality. The altercation in the car was provoked by insults and kicks administered by Sands. When he tried to protect himself from Sands attacks, Mize climbed over the seat and started to hit him. He did not kick Mize in the back of his head. During the entire sequence of events defendant was drunk.[4]

 Appointed counsel raises several issues. As far as the violation of section 10851 of the Vehicle Code is concerned, his argument is essentially an attempt to belittle the testimony of the victim and of Officer Alderson, coupled with a claim that the evidence is insufficient to show the specific intent necessary for a violation of section 10851.

While it is true that Alderson did not see too much of defendant when he started to give chase, his testimony as a whole leaves no doubt that the man he eventually caught up with was defendant. As far as Mrs. Kass is concerned, at the preliminary hearing, she had erroneously given the date of the disappearance of her car as July 22 and she was im-

[2]The officer's testimony was as follows: ". . . Officer Mize was driving, the defendant was in the back on the right-hand side, I was in the back on the left-hand side; we were going eastbound on 48th Street and we stopped for the stop sign at Hooper. At this time the defendant lifted both feet above the back seat and he kicked my partner, Officer Mize, in the back of the head."

[3]His precise testimony was as follows: "Q. After kicking Officer Mize what did the defendant do then? A. After the defendant kicked Officer Mize in the back of the head I attemped to subdue him, at which time I was kicked myself—correction. I myself was kicked on the left side of the head in attempting to subdue the defendant. Q. Did you have any injury from that kick? A. Yes. The left side of my head was swollen."

[4]Between himself and two other people there were consumed four fifths of whiskey, four bottles of vodka and four six packs of beer. Officer Mize, however, did not detect the odor of alcohol on defendant's breath.

peached with her testimony. The weight of the impeaching evidence was for the jury.

Turning to the specific intent required for a violation of section 10851, the evidence is ample. The car was taken by somebody. When the police attempted to stop defendant for a relatively minor violation, he fled the scene. *People* v. *Hopkins,* 214 Cal.App.2d 487, 491-493 [29 Cal.Rptr. 636] demonstrates that the general rule, announced in *People* v. *McFarland,* 58 Cal.2d 748, 754[5] [26 Cal.Rptr. 473, 376 P.2d 449] applies in prosecutions under section 10851 of the Vehicle Code..

.Defendant's next point, that at most he was guilty of a violation of section 499b of the Penal Code (joyriding), is answered by the foregoing discussion.

■ It is next contended that the conviction on counts III, IV and V is unconstitutional. The claim is made that nowhere does the Penal Code make it a separate crime to commit a battery on a peace officer engaged in the performance of his duties.

A battery is a battery whoever may be the victim. It is simply that section 243 of the Penal Code increases the punishment if the victim is a peace officer and certain other requirements are satisfied. There is nothing to defendant's argument that the two sections are unconstitutional in failing to inform him of the nature of the crime with which he was charged. It is certainly too late in the day to argue that the statutory definition of battery is "vague and indefinite" as defendant claims without supporting authority. Nor is defendant in a position to complain about the increased punishment. The information gave him ample notice that the People would attempt to prove facts justifying such punishment.

■ Finally defendant claims that his convictions on counts II, III, IV and V should be reversed because the officers used excessive force in making the arrest. The facts surrounding the arrest and the later fracas in the car are conflicting. The conflict was resolved by the jury which, as we shall presently see, gave the facts careful consideration.

■ This brings us to the last point, one that is not raised by defendant but by the Attorney General.

It will be recalled that count V charged a battery on Officer

---

[5] "Possession of recently stolen property is so incriminating that to warrant conviction there need be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt." (*Ibid.,* p. 754.)

Sands, and count VI a similar offense, on Officer Mize. The jury returned a verdict of "guilty" on count V but reported itself divided, eight to four, on count VI. The People then moved to dismiss count VI. The motion was granted. Then there followed a colloquy between the court and the foreman of the jury in which other jurors joined from time to time. It became apparent that, as one juror put it, the jury "had it backwards." They thought that Sands was the victim named in count VI. Eight jurors who had voted to acquit on that count did not believe that defendant had committed a deliberate battery on Sands when the officer tried to subdue him.

Several factors combine to create this rather perplexing situation. First a little more imagination could have been used in the drawing of the information. Mize was the first person attacked in the car, so logically the count which named him as a victim should have been given the lower number.[6] Second, when an information contains multiple counts involving multiple victims of identical crimes, the verdict forms given to the jury should identify the various victims in some fashion. The ones in the case at bar did not. Third, had the court, before dismissing count VI, through careful questioning of the jury, ascertained that they had their victims "backwards" they could have been returned to the jury room and requested to reconsider counts V and VI. Instead there was the dismissal of count VI, followed by the informal conversation between the court, the foreman and several other jurors.

After giving this matter much consideration, we have come to the conclusion that we should do nothing. Whether that would be the proper course in similar, but not identical, situations is beside the point. Unquestionably there was sufficient evidence on count V (Sands). If we reversed, we would set aside a verdict on the unsworn statements of the foreman and a few fellow jurors. This would violate the principle against impeachment of verdicts by the jury. (Witkins, Cal. Criminal Procedure (1963) § 553, p. 564.) The values protected by this principle have been thought to be sufficiently high even in situations where an injustice may well have resulted from its application. Certainly we should not ignore it where no possible prejudice results.

The judgment is affirmed.

Stephens, J., and Moor, J. pro tem.,* concurred.

---

[6]Mize was also the first of the two officers to testify to the event in the car.

*Assigned by the Chairman of the Judicial Council.